UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL DELTA WATER AGENCY and SOUTH DELTA WATER AGENCY,<br><br>               Plaintiffs,<br><br>         v.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE, *et al.*,<br><br>             Defendants. | 1:09-CV-00861 OWW DLB<br><br>MEMORANDUM DECISION AND ORDER GRANTING MULTIPLE MOTIONS TO DISMISS (DOCS. 106, 107, 112, 113, 114, 116, 118), GRANTING IN PART AND DENYING IN PART WATER AGENCY DEFENDANTS' MOTION TO STRIKE (DOC. 173), AND DENYING AS MOOT STATE DEFENDANTS' MOTION TO QUASH SERVICE (DOC. 105). |

I. <u>INTRODUCTION</u>

This case concerns the ongoing development and preliminary environmental review of the Bay Delta Conservation Plan ("BDCP"), a yet-to-be consummated collaborative approach to restoring the Sacramento-San Joaquin Delta ecosystem, while also protecting water supplies.  *See* Defendants' Request for Judicial Notice ("DRJN"), Ex. A, BDCP: An Overview and Update (March 2009) ("Overview and Update").  Plaintiffs, Central Delta Water Agency and South Delta Water Agency, filed this lawsuit against the members of the BDCP "Steering Committee,"[1] alleging that:

_____

[1] The "Steering Committee" is made up of federal, state, and local water agencies, as well as nonprofit organizations. Overview and Update at 17.  Defendants United States Fish and

(1) defendants initiated the scoping process under the National Environmental Policy Act ("NEPA") and the California Environmental Quality Act ("CEQA") without releasing to the public a sufficiently detailed BDCP project description; (2) in retaining a contractor to study the BDCP's possible environmental impacts, defendants violated federal regulations governing contractor conflicts-of-interest; (3) federal and state agencies impermissibly are coordinating their NEPA/CEQA compliance activities; (4) the BDCP lists conservation and water supply as co-equal project goals in violation of the California Natural Communities Conservation Planning Act ("NCCPA"); and (5) the BDCP Steering Committee's meetings did not comply with the California's Bagley-Keene Open Meeting Act. *See* Doc. 1, Complaint.  Plaintiffs have since abandoned their conflict-of-interest and NCCPA claims.  Doc. 157 at 2 n.2.

Six groups of defendants move to dismiss all of the claims in the Complaint.  Doc. 106 (California Farm Bureau Federation ("CFBF")), Doc. 107 (Environmental Non-Profits), Doc. 112 (Federal Defendants), Doc. 113 (Mirant Delta LLC), Doc. 114 & 118 (Water Agency Defendants), Doc. 116 (State Defendants).  The memoranda in support of these motions overlap to a considerable degree.  With leave of court, Plaintiffs filed a consolidated,

Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), are *ex officio* members of the Steering Committee.  *See* DRJN Ex. B, "Planning Agreement regarding the [BDCP] (Oct. 6, 2006) ("Planning Agreement") at 14.

seventy-six page opposition.  Doc. 157.  All of the moving

parties replied, again with largely overlapping memoranda.  Docs.

175, 177-181.

Defendants jointly filed a request for judicial notice.

Doc. 110.  Plaintiffs also filed a separate request for judicial

notice.  Doc. 165.  The Water Agency Defendants move to strike

certain declarations and exhibits submitted by Plaintiffs in

opposition to the motions to dismiss.  Doc. 173.[2]

## II. STATUTORY BACKGROUND

A.   NEPA.

With the passage of NEPA in 1970, Congress "recognize[ed]

the profound impact of man's activity on the interrelations of

all components of the natural environment" and "declare[d] that

it is the continuing policy of the Federal Government, in

cooperation with State and local governments, and other concerned

public and private organizations, to use all practicable means

and measures ... to create and maintain conditions under which

man and nature can exist in productive harmony, and fulfill the

_____

[2] Plaintiffs object to the hearing of this motion to strike, which contains evidentiary objections directly related to the pending motions to dismiss, on less than thirty days notice. Doc. 182 at 2.  This objection is without merit.  Local Rule 78-230(e) allows any party to file a counter-motion or other motion that is related to the general subject matter of the original motion.  The district court "may" then continue the hearing "so as to give all parties reasonable opportunity to serve and file oppositions and replies to all pending motions."  *Id*.  Here, the motion to strike was filed August 17, 2008, leaving Plaintiffs adequate time to file an opposition, which they did, on August 18, 2009.  There was no need to continue the hearing schedule.

3

social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331.  In order to facilitate informed decision-making and public disclosure, federal agencies prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  *Id*. § 4332(C).

NEPA, along with implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), establishes procedures agencies must follow in determining whether an EIS is required and in developing the EIS itself.  One of the first steps in the process of developing an EIS is "scoping," an "early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action."  *Id*. § 1501.7.  As soon as practicable after the decision is made to prepare an EIS and before scoping takes place, the lead agency[3] must publish in the Federal Register a Notice of Intent ("NOI"), which must briefly describe the proposed action and proposed alternatives, provide contact information for an agency representative to answer questions about the project, and describe the agency's proposed scoping process.  40 C.F.R. § 1508.22.

---

[3]  Where multiple agencies are involved in a project, the regulations mandate that there be a lead agency in preparing the EIS, but allow agencies to serve as "joint lead agencies" in order to facilitate inter-agency cooperation.  40 C.F.R. § 1501.5.

**B.   Administrative Procedure Act ("APA").**

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  Where no other statute provides a right of action, the "agency action" at issue must also be "final agency action." § 704.  "A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." *Id*.  "Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." § 551(13).  Agency action is considered final if it "mark[s] the consummation of the agency's decision making process" and defines parties' rights and obligations or carries other legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

### III. FACTUAL BACKGROUND

This is yet another lawsuit arising out of the "increasingly significant and intensifying conflict" between the ecological needs and sustainability of the Sacramento San-Joaquin Delta ("Delta") and the human users of the Delta's resources.  *See* DRJN, Exhibit E, Overview of the Draft Conservation Strategy for the BDCP at 3 (Jan. 12, 2009) ("Draft Overview").  The Delta is the largest estuary on the west coast of the Americas, and

includes parts of five California counties (Contra Costa, San

Joaquin, Sacramento, Solano, and Yolo).  Compl. ¶84.  The estuary

supports more than 750 species of plants and wildlife, including

several species protected by the federal Endangered Species Act

("ESA").  Compl. ¶85.  Twenty-three million people, two-thirds of

California's population, obtain some of their drinking water from

Delta supplies.  Compl. ¶86.  In addition, more than 4 million

acres of farmland are irrigated with water from the Delta.  *Id*.

The Delta is the hub of both the federal Central Valley

Project ("CVP") and the State Water Project ("SWP")

(collectively, "the Projects"), which pump water from the Delta

near the city of Tracy to supply municipal, industrial, and

agricultural users to the south.  *See* Compl. ¶86.  The Projects

currently use the Delta's natural and man-made channels to convey

water from incoming watersheds to those pumps.  This arrangement

has deleterious effects on the ecosystem, while related efforts

to protect the environment cause uncertainty for those who

receive water from the Delta.  *See* Draft Overview at 3.  "[T]he

continuing subsidence of lands within the Delta, increasing

seismic risks and levee failures, and sea level rise associated

with climate change, serve to exacerbate these conflicts."  *Id*.

There is little dispute that the current system is in need of

fundamental restructuring.

In 2006, various federal and state regulatory agencies,

6

water districts, and other interested parties, began to develop the BDCP, with the stated goal of "provid[ing] for the conservation of threatened and endangered fish species in the Delta and improv[ing] the reliability of the water supply system within a stable regulatory framework." Compl. ¶95; Overview and Update at 1. The participants in the BDCP process have all recognized that solving the Delta's problems will require, among other things, capital improvements to the Delta's water conveyance system. BDCP Notice of Intent and Notice of Public Scoping Meetings, 74 Fed. Reg. 7,257, 7,259 (Feb. 13, 2009)("February 2008 NOI"). Through the BDCP, Defendants intend to obtain long term incidental take permits for any planned changes to the Projects under the NCCPA and ESA. Compl. ¶104.

The "principal forum within which key policy and strategy issues pertaining to the BDCP will be discussed and considered" is the "Steering Committee," a group made up of the relevant federal and state regulatory agencies, numerous water contractors, and nonprofit organizations, who all signed a "Planning Agreement," setting forth the goals of the BDCP planning process. *See* Planning Agreement at 22-25.

On January 24, 2008, NMFS and FWS published a "Notice of Intent to Conduct Public Scoping and Prepare an Environmental Impact Report/Environmental Impact Statement," broadly outlining the BDCP. 73 Fed. Reg. 4,178 (Jan. 24 2008) ("January 2008

NOI"). The January 2008 NOI explained:

> The applicants have identified four potential water
> conveyance options that are being considered for the
> habitat conservation planning process: (1) the existing
> conveyance and system without physical change to
> conveyance facilities, (2) changes to conveyance in San
> Joaquin Old and Middle River channels plus separation
> of San Joaquin corridor from through-delta conveyance,
> (3) a dual conveyance in which existing conveyance
> would still be operational plus an isolated facility
> (not yet constructed) from the Sacramento River to the
> south Delta, and (4) an isolated conveyance facility
> (not yet constructed) from the Sacramento River to the
> south Delta. These four options are undergoing
> evaluations through the BDCP Steering Committee to
> assess the relative ability of each to contribute to
> the goals and objectives of the planning effort.
> Although the applicant has not yet decided which
> option(s) will be submitted for consideration under
> section 10 of the Endangered Species Act, the intent is
> to narrow the project focus to one or two of the four
> options or a mixture thereof by fall 2007.

*Id.*

The NOI was updated on April 15, 2008: (1) adding BOR as a
third co-lead federal agency; (2) providing further details on
the project; and (3) announcing the dates, times, and locations
of ten scoping meetings throughout California, held in April and
May 2008.  73 Fed. Reg. 20,326 (Apr. 15, 2008) ("April 2008
NOI").  The April 2008 NOI described the BDCP as follows:

> The BDCP will have several core purposes: Habitat
> restoration and enhancement to increase the quality and
> quantity of habitat in the Delta; other conservation
> actions to help address a number of stressors on
> covered species; conveyance facilities to enhance
> operational flexibility and water supply reliability
> while providing greater opportunities for habitat
> improvements and fishery conservation; water operations
> and management actions to achieve conservation and
> water supply goals; and a comprehensive monitoring,
> assessment, and adaptive management program guided by
> independent scientific input. Additional core purposes
> of the BDCP are to provide for the conservation of
> covered species within the planning area; to protect
> and restore certain aquatic, riparian, and associated

8

terrestrial natural communities that support these
covered species; and to provide for and restore water
quality, water supplies, and ecosystem health within a
stable regulatory framework. The EIS/EIR will evaluate
the effects of implementing the BDCP, conveyance
alternatives, and power line alignments, other
nonstructural alternatives, and describe the permits
necessary for BDCP implementation.

The BDCP will likely consist of several major elements,
including new capital improvements to the water supply
conveyance system, a restoration program for important
habitats within and adjacent to the Delta in order to
improve the ecological productivity and sustainability
of the Delta, and monitoring and adaptive management
for the restoration program. The plan will also likely
include operational improvements for the water supply
system in the near-term and for the long-term once any
capital improvements have been completed and are
operational.

73 Fed. Reg. 20,327.  The April 2008 NOI then explained that the

BDCP may include, but is not limited to, the following

activities:

• Existing Delta conveyance elements and operations of
the CVP and SWP;
• New Delta conveyance facilities (including power line
alignments) and operations of the CVP and SWP generally
described in the BDCP November 2007 Points of
Agreement;
• Operational activities, including emergency
preparedness of the CVP and SWP in the Delta;
• Operational activities in the Delta related to water
transfers involving water contractors or to serve
environmental programs;
• Maintenance of the CVP, SWP, and other PREs'
facilities in the Delta;
• Facility improvements of the CVP and SWP within the
Statutory Delta...;
• Ongoing operation of and recurrent and future
projects related to other Delta water users, as defined
by the Planning Agreement;
• Projects designed to improve Delta salinity
conditions; and
• Conservation measures included in the BDCP,
including, but not limited to, fishery related habitat
restoration projects, adaptive management, and
monitoring activities in the Delta.

9

*Id.* at 20,327-28.  The April 2008 NOI also pointed toward the

Steering Committee's "Points of Agreement" as the "basis for

alternative development":

> As part of the BDCP process, the Steering Committee
> evaluated potential options to address water supply
> reliability, water quality, and ecosystem health in the
> Delta. Initial options included various combinations of
> water conveyance facilities and habitat restoration
> actions. As a result of this evaluation, the Steering
> Committee developed the Points of Agreement document
> that provides an overall framework for moving forward
> with development of the BDCP. Previous evaluations and
> potential improvements to the water conveyance system
> and strategies for in-Delta habitat restoration and
> enhancement outlined in the Points of Agreement
> document will be used for the basis of alternative
> development, but will not preclude or limit the range
> of alternatives to be analyzed under NEPA.

*Id.* at 20,378.

Some comments received during the 2008 scoping meetings

indicated that more detailed descriptions of the proposed

activities and alternatives were needed to permit informed public

comment.  *See* 74 Fed. Reg. at 7,257.  In response, on February

13, 2009, the agencies published another NOI.  *See id.* at 7,257-

60.  The February 2009 NOI contained additional detail about the

BDCP's central elements and the alternative conveyance systems

under consideration:

> The BDCP will likely consist of three major elements:
> (1) Actions to improve ecological productivity and
> sustainability in the Delta; (2) potential capital
> improvements to the water conveyance system, and; (3)
> potential changes in Delta-wide operational parameters
> of the CVP and SWP associated with improved water
> conveyance facilities.
>
> Potential habitat restoration measures that could
> improve ecological productivity and sustainability in
> the Delta may involve the restoration of floodplain;

freshwater intertidal marsh; brackish intertidal marsh; channel margin, and riparian habitats. Floodplain restoration opportunities exist in the North Delta/Yolo Bypass and upper San Joaquin River areas; intertidal marsh restoration opportunities exist throughout the Delta and in Suisun Marsh. Channel margin habitat restoration opportunities exist for improving habitat corridors and as a component of floodplain restoration. Riparian habitat restoration opportunities exist as a component of floodplain, freshwater intertidal marsh, and channel margin habitat restoration.

Three general alternatives are being considered as they relate to the potential changes in the water conveyance system and CVP/SWP operations. These include: (1) A through-Delta alternative; (2) a dual conveyance alternative; and (3) an isolated facility alternative. In addition, the implications of taking no action, the No Action alternative, will be considered in the analysis. The dual conveyance alternative may include potential new points of diversion at various locations in the North Delta, facilities to move water from new points of diversion to the existing SWP and CVP pumping facilities in the South Delta, and continued use of the existing diversions in the South Delta. The fully isolated facility alternative would include potential new points of diversion at various locations in the North Delta and facilities to move water from new points of diversion to the existing SWP and CVP pumping facilities in the South Delta. The improved through-Delta alternative could include new temporary or permanent barriers to modify existing hydraulics or fish movement within the Delta, armoring of levees along Delta waterways to ensure continued conveyance capacity, and/or actions to improve conveyance capacity in existing Delta waterways.

New points of diversion could be located along the Sacramento River between South Sacramento and Walnut Grove. The new conveyance facility could extend from the new points of diversion to the existing SWP and CVP pumping facilities in the South Delta and be located either to the west or east of the Sacramento River. Potential CVP/SWP operations changes include the seasonal, daily, and real time amounts, rates, and timing of water diverted through and/or around the Delta. Potential corresponding changes to water exports could also be developed.

Other actions to reduce threats to listed fish that may be evaluated for implementation by the BDCP include measures to minimize other stressors. These other stressors may include: (1) Non-native invasive species; (2) toxic contaminants; (3) other water quality issues; (4) hatcheries; (5) harvest; (6) non-project

11

1

2

3

4

5

6

7

8

9

          diversions; and (7) commercial/recreational activities.
          Implementation of potential habitat restoration
          activities and measures to minimize other stressors
          will be evaluated throughout the Delta, and possibly
          upstream and downstream of the Delta, as appropriate to
          meet the objectives of the plan.

          Preliminary locations, alignments, and capacities of
          new conveyance facilities, as well as habitat
          restoration activities and actions to address other
          stresses, to be evaluated in the EIS/EIR will be
          informed by the scoping process. In addition to the
          alternatives described above, other reasonable
          alternatives identified through the scoping process
          will be considered for potential inclusion in the
          alternatives analysis.

10

*Id.* at 7,259-60.

11

12

    The co-lead agencies held a second round of twelve scoping

meetings around the State in March 2009.  *See id.* at 7,257.

13

Comments submitted during both the 2008 and 2009 rounds of

14

scoping meetings will be considered during the preparation of the

15

EIS/EIR.  *Id.*

16

    Plaintiffs complain that the NOIs were "ambiguous," Compl.

17

18

¶100, and that neither the NOIs nor related documents, including

the January 2009 "Overview of the Draft Conservation Strategy for

19

20

the [BDCP]," provide sufficiently detailed information about the

21

BDCP, Compl. ¶101:

22

23

24

25

26

27

28

          108. The language in the NOI is muddled and ambiguous.
          The "BDCP covered activities may, but are not limited
          to existing or new activities related to" "new Delta
          conveyance facilities," "Facility improvements of the
          CVP and SWP within the Statutory Delta," "future
          projects related to other Delta water users," "Projects
          designed to improve Delta salinity conditions," and
          "Conservation measures included in the BDCP, including,
          but not limited to, fishery related habitat management,
          and monitoring activities in the Delta." (NOI, 7259
          (Exhibit 1) (bold added).)  However, the facilities to

12

1
2
3
4
5
6

be completed such as the new Delta conveyance
facilities, their nature and their location have yet to
be defined.  While a number of alternatives for the new
conveyance facilities have been mentioned in other BDCP
process documents, the new conveyance facilities remain
undefined in the NOI.  Also to be determined are the
goals and objectives of the BDCP, the species to be
covered, and the methods and locations of conservation.
Since the project is yet to be defined, it is
impossible to accurately describe.

7
8
9

109. Also, to the extent that any decisions about the
BDCP have been made, they are not accurately reflected
in the NOI.  The NOI lists a combination plate of the
following proposed actions as constituting the project:

10
11
12
13
14
15
16
17

The BDCP is a conservation plan....
[I]ncidental take permits (ITP) for water
operations and management activities .... These
incidental take authorizations would allow the
incidental take of threatened and endangered
species resulting from covered activities and
conservation measures that will be identified
through the planning process, including those
associated with water operations of the Federal
Central Valley Project (CVP), as operated by
Reclamation, the California State Water Project
(SWP), as operated by DWR, as well as operations
of certain Mirant Delta LLC (Mirant Delta) power
plants....

18
19
20

Authorizations that would allow projects that
restore and protect water supplies, water quality,
and ecosystem health to proceed within a stable
regulatory framework.  [NOI, p. 7257 (Exhibit 1).]

21
22
23
24
25
26
27

This description implies that the BDCP is a
conservation plan and a take permit for any activities
identified in the planning process and an array of
other non-specified "authorizations that would allow
projects."  This description is vague, and omits
certain activities that will be included, such as the
construction of a conveyance facility, identified in
the NOP and is unequivocally, contrary to law.  (NOP,
p. 7257 (Exhibit 1).)  While the location of the
conveyance facility is not precisely known, the NOI for
the BDCP fails to even include a list of cities and

28

13

counties where the facilities may be located and which entities' water supply and watersheds may be affected. Compl. ¶¶ 108-109.

Defendants move to dismiss the NEPA claim for lack of subject matter jurisdiction on standing, ripeness, and sovereign immunity grounds.  Alternatively, Defendants argue that the complaint fails to state a claim under NEPA.  Finally, Defendants argue that the state law claims should be dismissed because supplemental jurisdiction cannot be exercised unless the district court possesses subject matter jurisdiction over at least one federal claim.  Alternatively, Defendants argue that the state law claims should be dismissed on jurisdictional and/or substantive grounds.

## IV. STANDARD OF DECISION.

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a motion to dismiss for lack of subject matter jurisdiction.  It is a fundamental precept that federal courts are courts of limited jurisdiction.  Limits upon federal jurisdiction must not be disregarded or evaded.  *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 374 (1978).  The plaintiff has the burden to establish that subject matter jurisdiction is proper. *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994). This burden, at the pleading stage, must be met by pleading sufficient allegations to show a proper basis for the court to assert subject matter jurisdiction over the action.  *McNutt v.*

14

*General Motors Acceptance Corp.,* 298 U.S. 178, 189 (1936); Fed.
R. Civ. P. 8(a)(1).  When a defendant challenges jurisdiction
*facially,* all material allegations in the complaint are assumed
true, and the question for the court is whether the lack of
federal jurisdiction appears from the face of the pleading
itself.  *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th
Cir. 2004).

## V. ANALYSIS

A.   Evidentiary Matters.

    1.   Requests for Judicial Notice.

        a.   Defendants' Request for Judicial Notice.

Defendants jointly request judicial notice of six documents
pertaining to the BDCP, Doc. 110, all of which are officially
published online at the BDCP's website,[4] rendering them "capable
of accurate and ready determination by resort to sources whose
accuracy cannot reasonably be questioned."  Fed. R. Evid. 201.
All six documents are judicially noticeable for their existence
and content, although not for the truth of the matters asserted
therein.  In addition, three of the documents, the BDCP "Overview
and Update" (Mar. 2009), Planning Agreement (Oct. 2006), and
"Points of Agreement" (Nov. 2007), are properly considered
because they are relied upon extensively in the Complaint.
*Inlandboatmens Union of Pac. v. Dutra Grp.,* 279 F.3d 1075, 1083
(9th Cir. 2002) (although generally a district court may not

---

[4] http://resources.ca.gov/bdcp

consider material beyond the pleadings on a Rule 12(b)(6) motion,

a document to which the complaint specifically refers may be

considered if its authenticity is not questioned).

Defendants' request for judicial notice is GRANTED in its

entirety.

        b.   Plaintiffs' Request for Judicial Notice.

Plaintiffs request that judicial notice be taken of thirty

six (36) documents.  Doc. 165.  Many of these, namely Documents

1, 3-7, 9-15, 22-23, 25, 27-28, and 30-34, are statutes and/or

regulations, which may be considered as a matter of course,

without the necessity of judicial notice.  Three others,

Documents 17, 26, and 29, are treatises on NEPA and/or CEQA,

which, as generally recognized scholarly source material, may

also be considered, but only as persuasive authority.

Plaintiffs' Document 24 is a publication in the Federal

Register, which is judicially noticeable pursuant to 44 U.S.C. §

1507 ("contents of the Federal Register shall be judicially

noticed").  Documents 2 (BDCP Governance Working Group,

Preliminary Recommendations for Governance Structure), 8 (BDCP

EIR/EIS Process Presentation), and 16 (Memorandum Agreement for

Supplemental Funding), are judicially noticeable public documents

available on the BDCP website, although they are not admissible

for the truth of the matters asserted therein.  Documents 18

through 21 are Memoranda and Handbooks concerning the

16

implementation of NEPA, all of which are public records

judicially noticeable for their content and existence.  The same

applies to the opinions of the California Attorney General,

Documents 35 and 36, which are judicially noticeable persuasive,

but non-binding authority.  *See Louis v. McCormick & Schmick*

*Restaurant Corp.*, 460 F. Supp. 2d 1153, 1156 n.4 (C.D. Cal.

2006).

Plaintiffs' request for judicial notice is GRANTED as to

Documents 2, 8, 16, 18-21, and 24, and DENIED, as unnecessary, as

to all other documents, which, as statutory legal authorities,

may be considered without taking judicial notice.

2. <u>Motion to Strike.</u>

In support of their opposition to Defendants' motions,

Plaintiffs filed the Declarations of John Herrick, Manager and

General Counsel for South Delta Water Agency, Doc. 159, and Dante

John Nomellini, Sr., Manager and Co-Counsel for Central Delta

Water Agency, Doc. 158.  The Water Agency Defendants move to

strike both declarations in their entirety.

Water Agency Defendants argue that where motions to dismiss

present either a facial attack under Federal Rule of Civil

Procedure 12(b)(1) and/or arguments under Rule 12(b)(6), a court

is limited to consideration of the allegations contained in the

complaint, with two exceptions:

> First, a court may consider "material which is properly
> submitted as part of the complaint...." Second, under

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fed. R. Evid. 201, a court may take judicial notice of "matters of public record."

*Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (internal citations omitted).

Plaintiffs respond that extrinsic evidence is admissible here because the Water Agency Defendants' motion to dismiss actually is a <u>factual attack</u> on the complaint. Specifically, Plaintiffs point to Page 4, lines 27-28 of the Wager Agency Defendants' Motion, which states: "Defendant Water agencies bring a facial attack on subject matter jurisdiction, <u>and join in the subject matter jurisdiction attacks brought by the other defendants</u>." Doc. 118-2 at 4 (emphasis provided by Plaintiffs). Plaintiffs suggest, without identifying any specific arguments in the other parties' papers, that other Defendants' motions to dismiss raise factual attacks. They do not. For example, although several other parties challenge Plaintiffs' standing to sue, they do so based on the face of the complaint. *See* Doc. 112 (Federal Defendants assert that despite allegations of procedural injury in the form of the publication of the NOIs and the decision to conduct scoping prior to issuance of a draft BDCP, Plaintiffs cannot possibly identify any harm to their concrete interests that are reasonably probable to result from these actions, because publication of an NOI and conducting scoping will not result in the undertaking of a project). The Herrick and Nomellini declarations simply reiterate, albeit in greater

18

detail, assertions in the complaint (e.g., that the issuance of the NOIs and the early scoping process make it impossible for Plaintiffs to meaningfully participate in the NEPA process).  The assertions in the complaint must be accepted as true.  The Herrick and Nomellini declarations, even if admissible, cannot supplement the complaint.

Similarly, several Defendants argue that Plaintiffs' NEPA claim is not ripe for review, *see, e.g.*, Doc. 112-2 at 17-18, and/or that Plaintiffs' APA claim must be dismissed because no "final agency action" has been alleged, *see, e.g.*, *id*. at 12-17. In response, Plaintiffs argue, relevant to one of the ripeness factors, that delayed review would cause them hardship, Doc. 157 at 22-23, and, relying on a possible exception to the general rule that review is only permissible under NEPA upon issuance of an EIS or related finding, that Plaintiffs will be irreparably harmed if the NEPA violations are not remedied at an early stage. The Herrick and Nomellini declarations do not add anything material to the facts of the complaint.  These declarations merely re-assert that the procedural injury will cause Plaintiffs hardship because they will be precluded from meaningfully participating in the NEPA process, and will irreparably harm Plaintiffs because the process being followed by the agencies may preclude Plaintiffs from properly informing Defendants of their concerns.  These theories of harm and irreparable injury are more

19

appropriately presented as legal argument.  Extrinsic evidence is

unnecessary.  Water Agency Defendants' motion to strike the

Herrick and Nomellini declarations is GRANTED.

   The Water Agency Defendants also object to consideration of

Exhibits 3, 9, 10, 11, 12, 13, and 21, attached to the

Declaration of Glenn C. Hansen in Support of Plaintiffs'

opposition.  Docs. 160-64 & 173.  Water Agency Defendants object

that these documents are not appropriately considered in the

context of a facial attack under Rule 12(b)(1), nor are they

subject to judicial notice.  As to Exhibits 3, 10, and 21, these

correspond to Documents 2, 8, and 16, for which Plaintiffs'

request for judicial notice was GRANTED, which moots these

objections.

   As to Exhibits 9 (a June 24, 2008 letter from Environmental

Defense Fund, Natural Heritage Institute, The Bay Institute, and

the Nature Conservancy to California Assemblywoman Lois Wolk), 11

(a web page entitled "The Delta:  A Water Source for Most

Californians" from The Nature Conservancy's Web Site), 12 (a web

page entitled "Our Approach to Restoring Land, Water & Wildlife"

from the Environmental Defense Fund website), and 13 (a web page

entitled "Transforming How California Uses Water: Protecting the

Sacramento-San Joaquin Bay-Delta, an ecosystem in Crisis" from

the Environmental Defense Fund website), Plaintiffs contend that

these documents are admissible as non-hearsay party admissions,

citing Federal Rule of Civil Procedure 801(d)(2)(A) and 901, as well as *United States v. Traylor*, 656 F.2d 1326, 1332 (9th Cir. 1981).  All of these "admissions" appear to relate to Plaintiffs' theory that the Steering Committee is really a "joint venture" between all of its members.  *See* Doc. 157 at 7-8.  As the motions to dismiss are resolved on other, justiciability grounds, it is not necessary to address Plaintiffs' joint venture theory or the related admissions.  The Water Agency's motion to strike Documents 9 and 11-13 are DENIED AS MOOT.

B.    Threshold Jurisdictional Issues

1.    Standing.

To maintain an action in federal court, Plaintiffs must have Article III standing.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 872 (1990) ("*Lujan v. NWF*").  "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) [it] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  In addition to the Article III requirements, which are jurisdictional, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341-42 (2006), a

plaintiff who brings suit under the APA, 5 U.S.C. § 706, must also establish that it falls within the "zone of interest" of the statute under which the lawsuit is brought, *see City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004).

The burden of establishing the elements of standing falls upon the party asserting federal jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("*Lujan v. DOW*"). "[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Bennett*, 520 U.S. at 167 (quoting *Lujan v. DOW*, 504 U.S. at 561).

These requirements are relaxed somewhat where the injury alleged is procedural. In a "procedural injury" case, the plaintiff must show that: "(1) the [agency] violated certain procedural rules; (2) these rules protect a plaintiff's concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. and Resource Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006).

> A cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under NEPA when the plaintiff also alleges a "concrete" interest-such as an aesthetic or recreational interest- that is threatened by the proposed action.

*City of Sausalito*, 386 F.3d at 1197.  The "concrete interest"

test has been described "as requiring a 'geographic nexus'
between the individual asserting the claim and the location
suffering an environmental impact."  *Ashley Creek Phosphate Co.
v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005) (quoting *Cantrell v.
City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001)).

It is not disputed that Plaintiffs Central and Southern
Delta Water Agencies ("Delta Water Agencies") satisfy the
"geographic nexus" and organizational standing requirements.
*Hunt v. Washington State Apple Advertising Commission*, 432 U.S.
333 (1977), sets forth the requirements for organizational
standing:

> An association has standing to bring a suit on behalf
> of its members when: (a) its members would otherwise
> have standing to sue in their own right; (b) the
> interests it seeks to protect are germane to the
> organization's purpose; and (c) neither the claim
> asserted nor the relief requested requires the
> participation of individual members in the lawsuit.

*Id*. at 343.

The owners of lands that lie within the Delta Water
Agencies' geographic scope rely on diversions from the Delta for
their water supply, and the <u>potential</u> BDCP action of "reducing
South Delta exports" may negatively impact Delta Water Agencies:

> Reduction in south Delta exports, marginally increases
> salinity in the south and central Delta due to less
> dilution of saltier San Joaquin River Inflows and Delta
> island discharges, particularly in late summer and
> early fall. These increases in salinity would have
> minimal negative effects for covered species, but could
> have negative impacts for agricultural or municipal
> water users who divert from the south Delta if these

23

salinity levels exceed those needed by these uses.
Draft Overview at 32, 34.  The interests Plaintiffs seek to protect in this litigation are germane to the organizations' purposes.  The Delta Water Agencies are political subdivisions of the State of California, created by the legislature to ensure a dependable supply of water of suitable quality and acceptable salinity for the Delta to meet the needs of their constituent water users.  *See Central Delta Water Agency v. United States*, 306 F.3d 938, 945, 951 (9th Cir. 2002).  The charters of the two Delta Water Agencies allow them to commence litigation to further their goals.  *Id.*  Finally, no argument has been made that any of the claims alleged and/or relief sought by the Complaint requires the participation of individual landowners within Plaintiffs' areas of operation.

However, although necessary, organizational standing is not sufficient to establish standing in a procedural injury case. Plaintiffs must still establish that "it is reasonably probable that the challenged action will threaten their concrete interests." *Nuclear Info. and Resource Serv*, 457 F.3d at 949. "[A] free-floating assertion of procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." *Ashley Creek*, 420 F.3d at 938.  Here, Federal Defendants argue that "plaintiffs cannot show that it is reasonably probable that the challenged action

24

will threaten their concrete interests.  This is because, unlike most NEPA suits, the action challenged here is not the preparation (or lack thereof) of an EIS, but only the lead agencies' decision to publish an NOI and conduct scoping without first publishing a detailed draft of the BDCP."  Doc. 112-2 at 10.  There are no prescribed rules or procedures that govern preparation of the BDCP.

The Complaint alleges that because the NOI is insufficiently detailed, Plaintiffs "cannot determine what impacts the BDCP will have nor whether it complies with the law."  Compl. ¶117(c).  Plaintiffs also allege that the designation of multiple lead agencies "means that applicants, public officials and the general public do not know which NEPA procedures apply to the proposed project and therefore cannot know if the procedures are properly followed."  *Id*. at ¶117(b).  But, Plaintiffs do not set forth a plausible basis for finding that these challenged actions (i.e., the failure to issue a sufficiently detailed NOI, and the designation of multiple lead agencies) are reasonably likely to harm their concrete interests in the Delta.  It is possible that the BDCP will be developed in such a manner that any perceived harm to their concrete interests will be eliminated.  It is also possible that no BDCP will be finalized at all.  There is no legal requirement that a BDCP be completed.  In this sense, the challenge is premature.

1    This case is distinguishable from other situations in which

2    it was "reasonably probable" that a procedural injury under NEPA

3    would threaten a plaintiff's concrete interests.  For example, in

4    *City of Sausalito,* the plaintiff challenged a completed EIS.  The

5    Ninth Circuit did not require the plaintiff "to demonstrate that

6    a procedurally proper EIS will necessarily protect [a] concrete

7    interest...."  *Id*. at 1197.  Rather, it was enough to allege that

8    the plan approved by the EIS <u>will</u> result in harm to plaintiff's

9    concrete interests.  *Id*. at 1199.  Put another way "if the plan

10   is not implemented the 'reasonably probable' threat to

11   [plaintiff's] concrete [] interests will have been removed."

12   *Id*.; *see also Citizens for Better Forestry v. U.S. Dept of

13   Agriculture*, 341 F.3d 961, 975 (9th Cir. 2003).  Here, in

14   contrast, Plaintiffs have not and cannot allege that the BDCP

15   <u>will</u> result in any harm, as no BDCP exists.  *See Hawaii County

16   Green Party v. Clinton*, 124 F. Supp. 2d 1173 (D. Haw.

17   2000)("Plaintiff cannot have suffered an injury in fact when

18   Defendants have not yet taken final action.").

19        Plaintiffs cannot demonstrate standing to bring a procedural

20   injury claim under NEPA because it is not reasonably probable, at

21   this early juncture in the process, that their concrete interests

22   will be harmed.  What Plaintiffs in substance seek is to

23   structure the BDCP process to their liking as to make their input

24   "more effective."  They have not and cannot allege they have been

28                              26

completely excluded from providing their input in any public

scoping process.  Plaintiffs' NEPA claim must be dismissed for

lack of subject matter jurisdiction WITH PREJUDICE AND WITHOUT

LEAVE TO AMEND.

## 2.   Ripeness.

Alternatively, Defendants argue that Plaintiffs' claims are

not ripe for review.  Ripeness has both a constitutional and

prudential requirement designed "to prevent the courts, through

avoidance of premature adjudication, from entangling themselves

in abstract disagreements over administrative policies, and also

to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt

in a concrete way by the challenging parties." *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds*,

*Califano v. Sanders*, 430 U.S. 99 (1977).  In determining whether

a case is ripe, a court considers: "(1) whether delayed review

would cause hardship to the plaintiffs; (2) whether judicial

intervention would inappropriately interfere with further

administrative action; and (3) whether the courts would benefit

from further factual development of the issues presented." *Ohio*

*Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

### a.   Hardship.

Plaintiffs assert that delayed review would cause them

"hardship" because they would be unable to exercise their

27

procedural rights under NEPA.  Doc. 157 at 22.  In support of

this assertion, Plaintiffs rely on a quote from *Ohio Forestry*,

523 U.S. at 737, in which the Supreme Court stated that "a person

with standing who is injured by a failure to comply with the NEPA

procedure may complain of that failure at the time the failure

takes place, for the claim can never get riper."  This language

must be considered in context.  *Ohio Forestry* concerned an

environmental group's challenge to the approval of a Forest

Management Plan ("FMP") for the Wayne National Forest in Ohio.

The Supreme Court held that the challenge to the FMP was <u>not</u> ripe

for review.  With respect to the hardship prong, the Court

concluded that to withhold judicial consideration of plaintiffs'

claims would not cause hardship "as this court has come to use

that term" because the provisions of the plan challenged by

plaintiff "do not create adverse effects "of a sort that

traditionally would have qualified as harm," meaning:

> they do not command anyone to do anything or to refrain
> from doing anything; they do not grant, withhold, or
> modify any formal legal license, power, or authority;
> they do not subject anyone to any civil or criminal
> liability; they create no legal rights or obligations.
> Thus, for example, the Plan does not give anyone a
> legal right to cut trees, nor does it abolish anyone's
> legal authority to object to trees being cut.

*Id*. at 733.  The Court reasoned:

> Nor have we found that the Plan now inflicts
> significant practical harm upon the interests that the
> Sierra Club advances-an important consideration in
> light of this Court's modern ripeness cases. *See, e.g.,*
> *Abbott Laboratories, supra*, at 152-154. As we have

28

1

2

3

4

5

6

7

8

9

10

11

               pointed out, before the Forest Service can permit
logging, it must focus upon a particular site, propose
a specific harvesting method, prepare an environmental
review, permit the public an opportunity to be heard,
and (if challenged) justify the proposal in court.
*Supra*, at 1668-1669. The Sierra Club thus will have
ample opportunity later to bring its legal challenge at
a time when harm is more imminent and more certain. Any
such later challenge might also include a challenge to
the lawfulness of the present Plan if (but only if) the
present Plan then matters, i.e., if the Plan plays a
causal role with respect to the future, then-imminent,
harm from logging. Hence we do not find a strong reason
why the Sierra Club must bring its challenge now in
order to get relief. *Cf. Abbott Laboratories, supra*, at
152.

*Id*. at 733-34 (parallel citations omitted).

    The Court supported its finding that the challenges to the

FMP were not ripe for review by noting that "Congress has not

provided for preimplementation judicial review of forest plans."

*Id*. at 737.   The Court reasoned that an FMP, "which through

standards guides future use of forests," does not "resemble an

environmental impact statement prepared pursuant to NEPA."   *Id*.

               That is because in this respect NEPA, unlike the NFMA,
simply guarantees a particular procedure, not a
particular result. Compare 16 U.S.C. § 1604(e)
(requiring that forest plans provide for multiple
coordinated use of forests, including timber and
wilderness) with 42 U.S.C. § 4332 (requiring that
agencies prepare environmental impact statements where
major agency action would significantly affect the
environment). <u>Hence a person with standing who is
injured by a failure to comply with the NEPA procedure
may complain of that failure at the time the failure
takes place, for the claim can never get riper</u>.

*Id*. (emphasis added).

    Plaintiffs suggest that this passage means that a violation

of NEPA procedures, at any time during the NEPA process, is

29

1    automatically ripe for review.  This reading of *Ohio Forestry* is

2    unreasonable and unjustifiably interventionist, as it would

3    effectively grant any party the right to judicially interfere

4    with the administrative process without regard to ripeness in any

5    NEPA procedural injury case.  A more reasonable reading of this

6    language is found in *Sierra Club v. U.S. Army Corps of Engineers*,

7    446 F.3d 808, 815 (8th Cir. 2006)("*Sierra Club v. USACE*"),

8    interpreting this passage to mean that "[t]he Supreme Court has

9    strongly signaled that an that an agency's decision to issue

10   either a [Finding of No Significant Impact] or an [EIS] is a

11   'final agency action' permitting immediate judicial review under

12   NEPA."[5]

13

14

15   ─────────────────

16   [5]    Plaintiffs' reliance on *Sierra Club v. USACE* is similarly
     misplaced.  There, the Army Corps of Engineers issued an
17   Environmental Assessment ("EA") and Finding of No Significant
     Impact ("FONSI"), in lieu of an EIS, for a project to construct a
18   levee in Jefferson City, Missouri.  The government moved to
     dismiss environmental plaintiff's NEPA challenge, arguing that
19   there was no final agency action by the Corps because it had not
     yet entered into agreements with the City to construct the levee,
20   nor had it received funding from Congress for the project.  *Id.*
     The district court concluded the environmental plaintiffs lacked
21   standing because no injury was certain to occur until the
     relevant agencies took additional steps to finalize a levee
22   project.  *Id.* at 816.  The Eighth Circuit reversed, reasoning
     that "[i]njury under NEPA occurs when an agency fails to comply
23   with that statute, for example, by failing to issue a required
     environmental impact statement," and concluded, without providing
24   any reasoning, that "the NEPA dispute was ripe for judicial
     review when the lawsuit was filed...."  *Id.* (citing *Ohio
25   Forestry*, 523 U.S. at 737).
26       Plaintiffs' partially quote this case to argue that under
     NEPA "injury occurs when an agency fails to comply with the
27   statute....," but neglect to acknowledge that the remainder of
     this sentence adds the qualification:  "for example, by failing

28
                              30

1    Plaintiffs next cite a quote from *Sierra Club v. Marsh*, 714

2    F. Supp. 539, 590 (D. Maine 1989):

3            The ultimate harm protected by NEPA is harm to the
         environment, the risk of bureaucratic commitment may
4        cause real harm to the environment, as under
         NEPA, the court may not compel the agency to reach a
5        different result, but may only compel agency
         reconsideration of its earlier decision in light of the
6        new information acquired through recourse to the NEPA
         process.
7

8    *Marsh* entailed an application for a preliminary injunction to bar

9    the continuation of a construction project.  *Id*. at 543.  Here,

10   Plaintiffs apparently contend that the showing of "irreparable

11   harm" required to obtain a preliminary injunction is equivalent

12   to the ripeness "hardship" analysis.  Even assuming, *arguendo*,

13   this contention is valid, its application to this case is not.

14

15       The *Marsh* court found that no irreparable injury would

16   likely result from initiation of the second phase of the

17   construction project, and that even if plaintiffs were likely to

18   succeed on the merits of their NEPA claims, "a likelihood of

19   irreparable physical harm to the environment would have to be

20   demonstrated in order to obtain preliminary injunctive relief."

21   *Id*. at 543.  The First Circuit reversed, reasoning that NEPA

22   "seeks to create a particular bureaucratic decisionmaking

23   process, ... whereby administrators make important decisions with

24   an informed awareness of how the decision might significantly

25

26   ───────────────────────────────

27   to issue a required environmental impact statement."  *Id*. at 816.
     This case, like *Ohio Forestry*, stands for no more than that a
     plaintiff's injury is complete once an agency fails to complete
28   an EIS where one is required.

affect the environment." *Sierra Club v. Marsh*, 872 F.2d 497 (1st

Cir. 1989).  "[I]f any such decision is made without the

information that NEPA seeks to put before the decisionmaker, the

harm that NEPA seeks to prevent occurs."  *Id.*

> [T]he harm at stake is a harm to the <u>environment</u>, but
> the harm consists of the added risk to the environment
> that takes place when governmental decisionmakers make
> up their minds without having before them an analysis
> (with prior public comment) of the likely effects of
> their decision upon the environment. NEPA's object is
> to minimize that risk, the risk of uninformed choice, a
> risk that arises in part from the practical fact that
> bureaucratic decisionmakers (when the law permits) are
> less likely to tear down a nearly completed project
> than a barely started project. In Watt we simply held
> that the district court should take account of the
> potentially irreparable nature of this decisionmaking
> risk to the environment when considering a request for
> preliminary injunction.

*Id.* at 500-01 (emphasis in original).

On remand, the district court reasoned:

> A NEPA violation which deprives agency decisionmakers
> of an informed awareness of significant environmental
> consequences of the challenged action is deemed harmful
> to the environment, by virtue of the added risk to the
> environment, ... that arises in part from the practical
> fact that bureaucratic decisionmakers (when the law
> permits) are less likely to tear down a nearly
> completed project than a barely started project.

714 F. Supp. 539 at 546 (internal citations and quotations

omitted).  Critically, in *Marsh*, <u>the environmental review had

already taken place</u>, approving continued construction on the

project.  The question in *Marsh* was whether continued

construction should be enjoined while plaintiffs' claim that the

NEPA process had been inadequate was being litigated.  In such a

case, if a NEPA procedural violation deprives agency

32

1   decisionmakers of an informed awareness of significant

2   environmental consequences, such a procedural violation may be

3   deemed harmful to the environment, "by virtue of the added risk

4   to the environment, ... that arises in part from the practical

5   fact that bureaucratic decisionmakers ... are less likely to tear

6   down a nearly completed project than a barely started project."

7   *Id*.

8

9        Here, the issue is very different.  No project has yet been

10  formulated, nor can the record possibly reveal whether any NEPA

11  procedural violation has deprived agency decisionmakers of an

12  informed awareness of significant environmental consequences.

13  Plaintiffs suggest that they have suffered "hardship" because

14  they have been unable to meaningfully comment on the scope of the

15  EIS/EIR, which resulted in uninformed decision-making in

16  determining the scope of environmental review.  While the

17  environmental review process is in progress and incomplete, there

18  is no way to know what the ultimate scope of the environmental

19  review will be.

20

21       Plaintiffs also suggest that the "harm cannot be undone

22  after the EIS has been approved because the decision-makers'

23  judgment has been biased by the previously completed process."

24  Doc. 157 at 23.  This species of hardship is not recognized in

25  the law.  A very similar argument was rejected in *Muhly v. Espy*,

26  877 F. Supp. 294, 300 (W.D. Va. 1995), where plaintiffs argued

27

28

that "omission from the scoping process ... irreparably harmed them and that additional meetings with agency personnel will be meaningless."  Citing the Ninth Circuit's analogous decision in *Northwest Coalition for Alternatives to Pesticides v. Lyng,* 844 F.2d 588 (9th Cir. 1988), *Muhly* reasoned that, absent allegations of bad faith on the part of the agency, plaintiffs were not harmed by omission from the scoping process because plaintiffs would have ample opportunity to be heard in upcoming meetings and public comment processes concerning a draft EIS.  *Id*. at 301; *see also Bennet Hills Grazing Assoc. v. United States*, 600 F.2d 1308, 1309 (9th Cir. 1979) (request for injunction against agency proceeding with preparation of final EIS until plaintiffs had been given ninety days in which to comment on draft EIS not ripe for review because plaintiffs failed to show that judicial review after preparation of the FEIS would be inadequate as a matter of law).

The same conclusion is warranted here.  Absent an allegation of bad faith, which is not made, procedural irregularities in the early stages of the NEPA process cannot result in harm because Plaintiffs will have additional legally-guaranteed opportunities to participate.  Plaintiffs have not demonstrated hardship.

b.    Interference with Further Administrative Action.

The next ripeness factor concerns whether judicial intervention would inappropriately interfere with further

34

administrative action.  *Ohio Forestry*, 523 U.S. at 733.

Defendants maintain that Plaintiffs' judicial intervention into

the NEPA process would prove to be enormously disruptive.  Doc.

177 at 3 (Federal Defendant's Reply).

> The collaborative BDCP effort among the many federal,
> state, and local government agencies, water districts,
> non-governmental entities, and others is a substantial
> undertaking, recognizing the critical need for a
> different approach to conserve the many valuable
> resources of the Bay-Delta region and the water supply
> system that serves much of California and which depends
> on restoring a healthy ecosystem.  While the two
> plaintiff organizations and perhaps others may not
> support the initial planning effort, their evident
> dissatisfaction does not warrant the type of
> extraordinary intervention by the federal judiciary
> that the plaintiffs seek to impose.

*Id.*

Plaintiffs respond, incomprehensibly, that because it is

undisputed that the BDCP has yet to be defined, "judicial review

of the NOI at this stage would ensure that, once the project is

defined, the environmental review process is properly initiated

and the decision-making process properly informed."  Doc. 157 at

23.  This turns the ripeness doctrine on its head, the purpose of

which is "to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract

disagreements over administrative policies, and also to protect

the agencies from judicial interference until an administrative

decision has been formalized and its effects felt in a concrete

way by the challenging parties."  *Abbott Labs.*, 387 U.S. at 148-

49.

Plaintiffs rely on *Citizens for Better Forestry*, 341 F.3d at

1  970-971, 977 (9th Cir. 2003) ("*CBF*"), to support the proposition

2  that, where procedural statutes are at issue, courts have held

3  claims to be ripe despite related on-going administrative

4  processes.  In *CBF*, the Ninth Circuit held that a NEPA challenge

5  to a rule would not interfere with further administrative action,

6  despite the fact that the agency was working to produce a

7  replacement rule.  *Id.* at 977.  But, there, the Ninth Circuit

8  specifically found that the administrative process "is at a

9  resting place," because the original rule exists as an optional

10  protocol for the agency to follow while the new rule is being

11  developed.  *Id*.  Here, the administrative process is undisputedly

12  ongoing and no decision or rule has been made or promulgated.

13       Plaintiffs raise *Trustees for Alaska v. Hodel*, 806 F.2d

14  1378, 1381 (9th Cir. 1986), as an example of judicial

15  intervention.  The facts of *Trustees for Alaska* are entirely

16  distinguishable.  *Trustees for Alaska* addressed whether a

17  Legislative Environmental Impact Report ("LEIS") for a

18  statutorily-required report to Congress should be distributed for

19  public comment before submission of that Report to Congress.  The

20  Ninth Circuit held that plaintiffs' challenge to the agency's

21  "clear and final" decision not to provide for presubmission

22  public review and comment of the completed LEIS was ripe,

23  otherwise Congress might act on the Report, effectively causing

24  the plaintiffs to lose their rights to make pre-submission public

25  comments on the LEIS.  *Id*. at 1381; *see also Sierra Club v. U.S.*

26  *Dept. of Energy*, 287 F.3d 1256, 1263 (10th Cir. 2002)(challenge

27  to agency decision not to conduct NEPA or ESA analyses before

28  granting an easement to construct road was ripe, despite fact

1   that construction could not proceed without other approvals).

2   Here, by contrast, no portion of the BDCP NEPA review process has

3   yet reached a "clear and final" endpoint.

4        Plaintiffs' also rely on *National Wilderness Institute v.*

5   *U.S. Army Corps of Engineers*, 2001 U.S. Dist. LEXIS 25930 (D.D.C.

6   2001).  In that case, plaintiffs alleged that the defendant

7   agencies did not conduct a consultation under the ESA with

8   respect to the operation of an aqueduct, from which certain

9   discharges were allegedly harming listed species.  *Id*. at *19.

10  Defendants there argued that this challenge was not ripe for

11  review because the Environmental Protection Agency ("EPA") was,

12  at that time, in the process of issuing a new permit for the

13  discharges under the Clean Water Act ("CWA").  *Id*. at *17.  The

14  District of Columbia district court held that although the CWA

15  permitting process was ongoing, plaintiffs' ESA challenge to the

16  aqueduct was ripe.  *Id*. at *17-18.  Here, Plaintiffs' only

17  federal claim is based on alleged failure to comply with pre-EIS

18  NEPA procedures in connection with the development of the BDCP.

19  Allowing this claim to proceed would unwarrantedly interfere with

20  ongoing administrative scoping, planning and formulation

21  activities, which would make it impossible for the agency to

22  "correct its own mistakes and ... apply its expertise."  *Ohio*

23  *Forestry*, 523 U.S. at 735.

24       This factor weighs against assertion of jurisdiction.

25            c.   Benefit from Further Factual Development.

26       The final ripeness factor is whether the courts would

27  benefit from further factual development of the issues presented.

28

1   *Ohio Forestry*, 523 U.S. at 733.   This factor supports dismissal

2   where further factual development may provide additional focus,

3   the agency may revise the plan, or review may ultimately become

4   unnecessary.   *See Ohio Forestry*, 523 U.S. at 736.

5       Plaintiffs maintain that "[t]he NOI is a self-contained

6   notice that must inherently be based on the factual background

7   that exists prior to its issuance.   Therefore, there is no

8   further factual background to develop, and the NEPA claims are

9   ripe for judicial review."   Doc. 157 at 24.   This overly myopic

10  view of the ripeness cannot be the law.   Here, the planning

11  process is ongoing and subject to negotiations among many

12  stakeholders with widely competing interests.   The factual record

13  will benefit in numerous ways from further development in a

14  dynamic and constantly changing water system where complex

15  hydrodynamics and ecological considerations are continuously in

16  flux.   Additionally, scientific studies of the impact of Project

17  operations on threatened species that have precipitated altered

18  flow and water delivery regimes are ongoing.   Moreover, the

19  agency may (1) issue additional NOIs, updating the public on

20  developments in the BDCP process; (2) conduct further scoping

21  meetings; (3) issue a draft BDCP and allow public comment on

22  that; (4) fundamentally alter or abandon the currently preferred

23  BDCP alternative; or (5) abandon the project altogether for any

24  number of reasons.   Resolution of Plaintiffs claims is reasonably

25

26

27

28

38

likely to benefit greatly from further factual development by the administrative agencies.  The Plaintiffs offer no genuine value to their proposed interference with the planning process, which has the real potential to obstruct its progress.

### d.   Conclusion Re Ripeness.

All three ripeness factors weigh heavily against assertion of jurisdiction over Plaintiffs' NEPA claim.  Plaintiffs' NEPA claim is, alternatively, DISMISSED WITH PREJUDICE on this ground.

### 3.   Sovereign Immunity

#### a.   Agency Action.

Alternatively, Defendants argue that Plaintiffs' NEPA claim does not fall within the APA's limited waiver of sovereign immunity, precluding the exercise of subject matter jurisdiction over the only federal claim in this case.  NEPA contains no private right of action.  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004).  As a result, NEPA claims must be brought under the APA, and must fall within the APA's limited waiver of sovereign immunity.  *Id.*; *see also Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th Cir. 1998) (APA provides limited waiver of sovereign immunity in suits seeking judicial review of agency action).

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof." 5 U.S.C. § 702. To

trigger section 702's waiver, plaintiffs must "identify some

'agency action' that affects [them] in the specified fashion; it

is judicial review 'thereof' to which [they] are entitled."

*Lujan v. NWF*, 497 U.S. at 882.

"Agency action" is limited by statute to "the whole or a

part of an agency rule, order, license, sanction, relief, or the

equivalent or denial thereof, or failure to act." 5 U.S.C. §

551(13). A "failure to act" is merely "a failure to take one of

the agency actions (including their equivalents) earlier defined

in § 551(13)." *Norton v. S. Utah Wilderness Alliance*, 542 U.S.

55, 62 (2004) ("*SUWA*"). "All of those categories involve

circumscribed, discrete agency actions, as their definitions make

clear." *Id.*; see 5 U.S.C. §§ 551(4) (defining "rule"), (6)

("order"), (8) ("license"), 10 ("sanction"), (11) ("relief").

"The only action that can be compelled under the APA is action

legally required." *SUWA*, 542 U.S. at 63 (emphasis in original).

Even where a court is asked to compel agency action, it may only

direct the agency "to take action upon a matter, without

directing how it shall act." *Id.*

Here, Plaintiffs seek an order requiring federal defendants

to, among other things, release a draft of the BDCP to the

public, issue a new NOI, and conduct new scoping meetings.

Compl. ¶¶ 140, 149. Plaintiffs cannot dictate the terms or

content of any of these documents or meetings.  Moreover, none of

the complaint's allegations challenge any of the defined

categories of "agency action" or failure to undertake one of the

forms of agency action, namely the "whole or a part of an agency

rule, order, license, sanction, relief, or the equivalent or

denial thereof...."  5 U.S.C. § 551(13).  None of these statutory

types of administrative action has been taken, nor is there any

law requiring the involved agencies to take any such actions.

The cases cited by Plaintiffs are distinguishable.

*Coalition for Common Sense in Gov't Procurement v. Secretary of*

*Veterans Affairs*, 464 F.3d 1306, 1317 (Fed. Cir. 2006),

considered whether a letter issued by the Department of Veteran's

Affairs, requiring manufacturers of drugs covered by the

Department of Defense's ("DOD") health care plan to refund to DOD

the difference between the drugs' wholesale commercial price and

their federal ceiling prices, constituted agency action.  The

Federal Circuit concluded that the letter fell within 5 U.S.C.

§ 551(4)'s definition of a substantive "rule."  *Id.* at 1317.

Likewise, in *Oregon Natural Desert Association v. U.S. Forest*

*Service*, 465 F.3d 977, 983 (9th Cir. 2006), the Ninth Circuit

classified the Forest Service's issuance of "annual operating

instructions" ("AOIs") to permittees who graze livestock on

national forest land as "agency action."  Because each AOI was

specifically incorporated into each grazing license, an AOI is

1   "properly understood to be a license for purposes of determining

2   whether it is an agency action under the APA." *Id*.  Here, by

3   contrast, Plaintiffs point to not one "agency action" enumerated

4   in § 551 that could plausibly encompass the administrative

5   proceedings at issue in this case.

6

7       Plaintiffs repeat citation to *Trustees for Alaska*, 806 F.2d

8   at 1381, which concerned section 1002(h) of the Alaska National

9   Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3142(h).

10  ANILCA requires the Secretary of the Interior to submit a report

11  to Congress containing: (1) specific information about potential

12  oil and gas production, as well as fish and wildlife resources

13  within the coastal plain of the Artic National Wildlife Refuge

14  ("ANWR"); and (2) recommendations concerning possible development

15  of oil and gas within ANWR.  *Id*. at 1379.  Interior determined

16  that it needed to prepare a legislative EIS ("LEIS") in

17  connection with its development of the report, but refused to

18  provide public review and comment prior to submission of the LEIS

19  and the report to Congress.  *Id*. at 1380.  The Ninth Circuit held

20  that the case was <u>ripe</u> for review under *Abbott Laboratories*, 387

21  U.S. at 148-49 (1967), insofar as the "disagreement [between the

22  parties] is concrete.... clear and final," because Interior had

23  decided not to provide pre-submission public review and comment

24  and "denial of review at this point may impose substantial

25  hardship on the [plaintiffs]."  *Id*. at 1381.  *Trustees for Alaska*

26

27

28

did not even consider the APA's "agency action" requirement, which is distinct from the ripeness inquiry.

Because Plaintiffs have not and cannot allege that any APA "agency action," has been carried out, or that the agencies will not take any required action, the APA's waiver of sovereign immunity does not apply and the district court lacks subject matter jurisdiction over Plaintiffs' NEPA Claim, requiring its dismissal.

>    b.   Final Agency Action.

APA section 704 provides:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

Where review is sought "not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action 'agency action' in question must be 'final agency action.'" *Lujan v. NWF*, 497 U.S. at 882 (quoting 5 U.S.C. § 704). "The APA thus insulates from immediate judicial review the agency's preliminary or procedural steps." *Western Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189, 1196 (9th Cir. 1997). Section 704 in fact specifically

provides that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."

To be considered "final," the agency action (1) should "mark the consummation of the agency's decision-making process," and (2) "be one by which rights or obligations have been determined or from which legal consequences flow." *Bennett,* 520 U.S. at 177-78 (internal citations and quotations omitted).  Both conditions must be satisfied for agency action to be final.  *Id.* at 178.  The Supreme Court has "interpreted the 'finality' element in a pragmatic way." *FTC v. Standard Oil of Cal.*, 449 U.S. 232, 239 (1980).  "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  Certain factors provide indicia of finality, such as whether "the action amounts to a definitive statement of the agency's position," whether the action "has a direct and immediate effect on the day-to-day operations" of the party seeking review, and whether "immediate compliance with the terms is expected." *Oregon Natural Desert Ass'n,* 465 F.3d at 982 (internal citations and quotations omitted).  Finality is a jurisdictional requirement. *Lujan v. NWF*, 497 U.S. at 882; *Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990).

44

1

(1)  Consummation of Decision-Making Process.

2        To constitute the consummation of an agency's decision-

3   making process, the challenged act "must not be of a merely

4   tentative or interlocutory nature."  *Bennett*, 520 U.S. at 178.

5   The preliminary NEPA steps challenged by Plaintiffs are

6   inherently "tentative" and interlocutory in nature.  The agencies

7   engaged the public at an early stage to "ensure that the full

8   range of alternatives and issues related to the development of

9   the BDCP is identified."  74 Fed. Reg. at 7,260.  This is

10  consistent with the purpose of the scoping process, which is to

11  "begin[] a meaningful dialogue with members of the public about a

12  proposed action."  *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d

13  1094, 1117 (9th Cir. 2002).

14

15       An action marks the consummation of an agency's decision-

16  making process if it constitutes the agency's "last word on the

17  matter."  *Oregon Natural Desert Ass'n,* 465 F.3d at 984.  In the

18  NEPA context, the action must be the agency's "last word on the

19  project's environmental impact" as a whole.  *Friedman Bros. Inv.*

20  *Co. v. Lewis,* 676 F.2d 1317, 1319 (9th Cir. 1982).  The issuance

21  of a final EIS or a ROD constitutes final agency action.  *Sierra*

22  *Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) (citing *Oregon*

23  *Natural Resources Council v. Harrell*, 52 F.3d 1499, 1504 (9th

24  Cir. 1995)).  In contrast, preliminary decisions, even seemingly

25  final ones, prior to the issuance of a final environmental

26

27

28

documents are insufficient.  *See Western Radio Servs.*, 123 F.3d

at 1197 (final agency decision to construct road not final agency

action until EA completed and FONSI issued); *City of San Diego v.*

*Whitman*, 242 F.3d 1097 (9th Cir. 2001)(no final agency action

where agency issued letter rejecting request for agency's opinion

whether certain statutory requirements would apply to a not-yet-

filed application to renew a permit); *Earth Island Institute v.*

*Morse*, 2009 WL 2423478, *9 (E.D. Cal. 2009)(Regional Forester's

letter directing forest supervisors to ensure forest density does

not exceed "an upper limit" not final agency action because it

gives supervisor complete discretion to decide what upper limit

to use).

Plaintiffs maintain that the issuance of the NOI is not

tentative or interlocutory in nature, and does consummate the

agency's decision-making process.  Specifically, at oral

argument, Plaintiffs asserted that the issuance of the challenged

NOIs in this case constituted the consummation of the agency's

decision to move forward with the NEPA process before the project

had been developed.  In support of this assertion, Plaintiffs

cite *California v. Block*, 690 F.2d 753, 762 (9th Cir. 1982), for

the general proposition that agencies are "obliged to adhere to

the procedures mandated by NEPA."  This unsurprising holding has

nothing whatsoever to do with the "final agency action"

requirement.

1      Contrary to Plaintiffs' assertions, the NOI and ongoing

2  scoping activities are, by their very nature, not the agency's

3  "last word" on the BDCP.  The last word will be the final

4  adoption of a finite and certain BDCP that is intended to be

5  implemented.  Nor is the decision to designate a particular

6  combination of agencies as "lead agencies," as that designation

7  could be changed, actual roles shifted, and/or additional

8  justification provided for any such decision in the final

9  document.

10      This conclusion is supported by *Muhly*, 877 F. Supp. at 294,

11 where property owners claimed they were improperly excluded from

12 a NEPA scoping process.  The agencies had already: (1) decided

13 that the applicant's proposal called for major federal action,

14 thereby necessitating the creation of an environmental impact

15 statement; (2) published an NOI, as well as several revisions to

16 it; (3) and completed the scoping process and identification of

17 preliminary alternative.  *Id*. at 300.  Nevertheless, no final

18 agency action had taken place because "all of these steps mark

19 the infancy, not the termination, of the NEPA process."  *Id*.

20         This is clear when one considers what remains to be
21         done. Among the stages left to be completed are: the
           issuance of a [draft EIS]; public comment during a
22         compulsory forty-five day waiting period; and the
           issuance of a [final EIS]. All of these stages require
23         substantial input from the public, during which the
           Plaintiffs could conceivably cure any of the defects in
24         the NEPA process they believe have taken place so far.

25 *Muhly*, 877 F. Supp. at 300.  It need not be repeated that the

47

BDCP is still undergoing formulation and revision.

### (2)   Determining Rights, Obligations, or Legal Consequences

The second prong of the *Bennett* "final agency action" inquiry is whether the action is one by which rights or obligations have been determined or from which legal consequences flow.  520 U.S. at 178.  This test may be satisfied, for example, by an agency action that "alter[s] the legal regime...."  *Id*. *Bennett* held that the issuance of a Biological Opinion and accompanying Incidental Take Statement under the ESA altered the legal regime for the action agency by authorizing take of endangered species in a manner that was not previously permitted. *Id*.  In contrast, neither the NOI nor the decision to proceed with multiple lead agencies changes the legal regime governing agency action.

*Bennett's* second prong may also be met if agency action has a "direct and immediate effect on the day-to-day business' of the subject party," requiring "immediate compliance with [its] terms."  *F.T.C. v. Standard Oil*, 449 U.S. at 239 (internal citations and quotations omitted); *Hecia Min. Co. v. EPA*, 12 F.3d 164, 165-66 (9th Cir. 1993).  In *Hecia*, the Ninth Circuit found that the EPA's decision, made pursuant to CWA § 304, to include certain rivers on a list of a state's navigable waters not expected to meet water quality standards was not final agency action.  *Id*. at 165.  The listing decision "does not have the

48

status of law or a direct and immediate effect on the day to day business of the complaining party." *Id*. at 165-66.  Rather, the final agency action that would require action on the part of the plaintiff is the issuance of a CWA permit.  *Id*. at 166.  The listing decision was just a preliminary step in the permitting process.  *Id*.

Likewise, the issuance of an NOI, the early initiation of the scoping process, and/or the decision to use multiple lead agencies does not affect Plaintiffs' daily operations or require them to do, or refrain from doing, anything in formulating the BDCP.  These are merely preliminary procedures which will lead to the agency arriving at a final decision.  In this way, this case is more like *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1238 (11th Cir. 2003), where the Eleventh Circuit held that the National Park Service had not undertaken final agency action under the APA in evaluating various options for the management of Biscayne National Park, because it had "done nothing beyond establishing a committee to review alternatives[,] ... formulating management options and submitting those plans for public comment."  *Id*.  As a result, "no rights or obligations have been fixed by its behavior, nor has it taken (or refused to take) action so as to impose any legal consequence on any party."  *Id*.

1

             c.    <u>40 C.F.R. § 1500.3.</u>

2
      In arguing that their NEPA claim is reviewable under APA §

3
704, Plaintiffs point to 40 C.F.R. § 1500.3, a regulation

4
promulgated by the CEQ, the agency charged with implementing

5
NEPA.  These regulations, overall, are entitled to substantial

6
deference.  *See Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1244

7
(9th Cir. 1984).  Section 1500.3 provides, in pertinent part,

8
that, with respect to regulations implementing NEPA:

9

10
        It is the Council's intention that judicial review of
        agency compliance with these regulations not occur

11
        before an agency has filed the final environmental
        impact statement, or has made a final finding of no

12
        significant impact (when such a finding will result in
        action affecting the environment), or takes action that

13
        will result in irreparable injury.  Furthermore, it is
        the Council's intention that any trivial violation of

14
        these regulations not give rise to any independent
        cause of action.

15

16
It is undisputed that neither an EIS nor a FONSI has been

17
prepared in connection with the BDCP.  Plaintiffs claim that they

18
have suffered "irreparable injury" for the same reasons that they

19
claim "hardship" under the ripeness doctrine (e.g., that issuing

20
a NOI and conducting scoping prior to identifying the nature of

21
the project itself deprived them of a meaningful opportunity to

22
participate in the process).  The same result applies.

23

24
Plaintiffs' exclusive claims of preliminary procedural injury do

25
not rise to the kind of "hardship" or "irreparable injury"

26
necessary to invoke subject matter jurisdiction.  *See supra* Part

27

28

1   V.B.2.a.[6]  Plaintiffs are not entitled by law to direct or

2   dictate how the administrative formulation and ultimate adoption

3   of the BDCP is carried out.  If there are any infirmities in the

4   process, Plaintiffs may address any illegality at the appropriate

5   time, when all administrative actions to create a final BDCP have

6   occurred.

7

8   C.    State Law Claims/Supplemental Jurisdiction.

9        28 U.S.C. § 1367(a) provides:

10           Except as provided in subsections (b) and (c) or as
             expressly provided otherwise by Federal statute, in any
11           civil action of which the district courts have original
             jurisdiction, the district courts shall have
12           supplemental jurisdiction over all other claims that
             are so related to claims in the action within such
13           original jurisdiction that they form part of the same
             case or controversy under Article III of the United
14           States Constitution. Such supplemental jurisdiction
             shall include claims that involve the joinder or
15           intervention of additional parties.

16   Dismissal of all Federal claims under Rule 12(b)(1) for lack of

17   subject matter jurisdiction precludes the exercise of

18   supplemental jurisdiction.  *See Herman Family Revocable Trust v.*

19   *Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001).  Here, the only

20   federal claim under NEPA has been dismissed for lack of subject

21   matter jurisdiction on standing, ripeness, and sovereign immunity

22   (based on absence of final agency action) grounds.  Supplemental

23

24

25   [6]    Whether, in light of the APA's clear imposition of a "final
     agency action requirement, the CEQ can carve out an additional
26   exception to the "final agency action" requirement that permits
     challenges to non-final actions upon a showing of "irreparable
27   injury," was not raised by the parties.  Nor is it necessary to
     adjudicate that question here, as multiple, alternative grounds
28   for dismissal are present.

jurisdiction may not be exercised over the Plaintiffs' state law claims.  28 U.S.C. § 1367(c).  A federal court has no interest in state claims which are derivative of purported federal claims over which no federal jurisdiction exists.

D.   Motion to Quash Service.

Dismissal with prejudice of this action renders State Defendants' motion to quash service moot.  Doc. 105.

VI. CONCLUSION.

Defendants' motions to dismiss are GRANTED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.  Plaintiffs do not have standing to bring their sole federal claim, arising under NEPA. Alternatively, Plaintiffs' NEPA claim (1) is not ripe for review, and (2) does not fall within the APA's limited grant of sovereign immunity because there has been no final agency action.

Defendants shall submit a form of judgment terminating this action in accordance with this memorandum decision and order within five days of electronic service.

SO ORDERED

Dated:  September 8, 2009              /s/ Oliver W. Wanger
                                     Oliver W. Wanger
                              United States District Judge